**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**DONALD P.,**

                                        **Plaintiff,**

v.                                                                    **6:20-CV-00216 (NAM)**

**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**

_____

**APPEARANCES:**

Steven R. Dolson, Esq.
Law Offices of Steven R. Dolson
126 N. Salina Street, Suite 3B
Syracuse, NY 13202
*Counsel for Plaintiff*

Christopher L. Potter, Esq.
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, MA 02203
*Counsel for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Donald P. filed this action under 42 U.S.C. § 405(g), challenging the denial of

his application for Social Security Disability ("SSD") insurance benefits.  (Dkt. No. 1).  The

parties' briefs are presently before the Court.  (Dkt. Nos. 7, 9).  After carefully reviewing the

administrative record, (Dkt. No. 6), the Court affirms the denial decision.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff applied for disability benefits in December 2016, alleging that he had been disabled since May 8, 2015.  (R. 132).  Plaintiff claims he is disabled due to psoriatic arthritis, anxiety disorder, and depression.  (R. 146).  The Social Security Administration ("SSA") denied Plaintiff's application on April 3, 2017.  (R. 65–69).  Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 75). The hearing was held on November 29, 2018 before ALJ Monica D. Jackson; Plaintiff appeared and testified, as did a vocational expert.  (R. 30–53).  On February 19, 2019, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 12–29).  Plaintiff's request for review by the Appeals Council was denied on January 8, 2020.  (R. 1–6).  Plaintiff then commenced this action on February 27, 2020.  (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was born in 1966.  (R. 168).  He graduated with a bachelor's degree in accounting in 1988.  (R. 35, 147).  Plaintiff reported that he worked as a budget analyst and financial services manager from 1998 to 2015.  (R. 147).  Plaintiff testified that he left that job because he was "laid off."  (R. 36).

Plaintiff stated that his medical conditions cause "chronic pain" that prevents him from working in a similar position today.  (R. 36).  He stated that his pain prevents him from being able to think and learn.  (R. 36).  He described the pain as a "constant ache," and noted that he feels pain in his head, neck, back, shoulder, fingers, and toes.  (R. 162).  He stated that his pain has been constant since 1999, and that it never goes away and is aggravated by lifting and sleeping.  (R. 162).  Plaintiff reported that if he had a similar job now, he would be "coasting

through it instead of being engaged like I used to be," because "[t]he pain [has] pretty much dominated my whole life." (R. 36). Plaintiff explained that he suffers from "chronic daily headache every day," "neckache," and "backache," and described himself as "a totally different person now that I used to be when I started out working." (R. 37). He reported that he suffers from pain every day, but his medications help to control the swelling related to his arthritis and psoriasis. (R. 38). He stated that he "was unable to walk before starting his rheumatoid medication." (R. 38–39). Plaintiff stated that he could stand or walk for roughly 20 minutes before needing to stop, sit for about an hour without getting up, lift or carry about 20 pounds. (R. 39–40). He reported no trouble using his hands, but described them as "stiff," and stated that he has trouble stooping, kneeling, crouching, and crawling. (R. 40).

Plaintiff also reported that he has suffered anxiety and depression since 1999, which caused panic attacks where his "head and neck would tighten," and he had "major problems concentrating." (R. 163).

With regard to daily activities, Plaintiff stated that he spends most of his time watching television, browsing the internet, and taking naps. (R. 40, 154). He reported that he "used to be able to play golf frequently and walk 18 holes." (R. 155). Plaintiff reported that he is able to go outside frequently, to go out to dinner several times a month, and shop once a week for about an hour. (R. 157–58).

### C.  Medical Evidence of Disability[1]

Plaintiff's disability claim stems from complaints of psoriatic arthritis, anxiety, and depression. (R. 146). Plaintiff also asserts that he has fibromyalgia, Bell's palsy, cervical and lumbar degenerative disc disease, and headaches. (R. 17, 196). Plaintiff claims that he has

---

[1] Plaintiff only challenges the ALJ's conclusions as to his physical impairments. (*See generally* Dkt. No. 9). Therefore, the Court will not discuss the medical evidence related to Plaintiff's mental impairments.

struggled with these conditions since 1999 and has received treatment from a number of medical providers.

### 1.  Dr. Ute Dreiner, Treating Rheumatologist

Plaintiff was treated by Dr. Ute Dreiner for his chronic pain from March 2011 through at least August 2018.  (*See generally* R. 204–365, 570–618, 638–40).  Dr. Dreiner saw Plaintiff regularly, with visits every three to four months.  (R. 638).  Throughout that treatment period, Plaintiff reported that for many years he suffered from generalized pain throughout his body.  (*See, e.g.*, R. 204, 210, 224, 362, 584, 605, 616).  Plaintiff reported that the severity of his pain varied from between zero and ten on a ten-point "pain scale."  (*See, e.g.*, R. 205, 222, 242, 254, 263, 579, 585, 599).  Plaintiff described having "good days and bad days."  (*See, e.g.*, R. 448, 521, 530, 608).  Dr. Dreiner diagnosed Plaintiff with psoriatic arthropathy, psoriasis, and fibromyalgia.  (*See, e.g.*, R. 205, 231, 275, 586, 600).  Dr. Dreiner treated Plaintiff's pain symptoms with medications including Humira, Enbrel, Methotrexate, Prednisone and Gabapentin.  (*See generally* R. 38–39, 255, 580, 590, 600, 610).  Dr. Dreiner's treatment records also show that Plaintiff reported varying and inconsistent episodes of stiffness, joint pain/swelling, and nerve sensitivity.  (*See e.g.*, R. 42–43, 213, 216, 363, 376, 584, 591, 608).

In October 2018, Dr. Dreiner completed a residual functional capacity questionnaire, which describes Plaintiff's general conditions as "chronic" with "no substantive improvement anticipated."  (R. 638).  She noted that "emotional factors contribute to the severity" of Plaintiff's symptoms, and she assessed that his impairments were "reasonably consistent with [his] symptoms and functional limitations."  (R. 638).  Dr. Dreiner assessed that his conditions would be severe enough to interfere with his attention and concentration for more than 30 percent of the workday.  (R. 638).  She further assessed that Plaintiff could only walk one city

block without rest, stand for no more than 30 minutes, and could only sit for two hours at a time.  (R. 639).  She opined that Plaintiff would need periods of walking throughout the day, he could only stand/walk for about two hours in a day, and he could sit for about four hours in a workday.  (R. 639).  She assessed that Plaintiff suffered from "significant limitations with reaching, handling, or fingering," and noted that he could rarely lift and carry 20 pounds.  (R. 639).  She reported that his conditions would require unscheduled breaks and could cause him to be absent from work more than four days per month.  (R. 639–40).  Dr. Dreiner opined that Plaintiff's conditions produce "good days and bad days," and that he would be incapable of sustaining full-time work.  (R. 640).

### 2.  Dr. Elke Lorensen, Consultative Physical Examiner

In February 2017, Plaintiff presented to Dr. Elke Lorensen for a consultative physical examination.  (R. 451–62).  Plaintiff reported that his primary complaints were psoriatic arthritis, fibromyalgia, chronic muscle pain, and chronic tension headache.  (R. 459).  Plaintiff reported chronic pain all over his body, and noted that nerve block procedures in his neck were ineffective.  (R. 459).  Plaintiff reported to Dr. Lorensen that he shops once per week, showers and dresses daily, and spends most of his time watching television, listening to the radio, and socializing.  (R. 460).  He stated that his girlfriend does the cooking, cleaning, and laundry.  (R. 460).  He reported that his medical conditions "began in 1999 when he suddenly felt the onset of a headache and then the pain spread through his body."  (R. 459).  Dr. Lorensen noted that he was treating his conditions with medications including Enbrel, Celexa, Klonopin, and Neurontin.  (R. 460).

Dr. Lorensen observed that Plaintiff did not appear to be in acute distress, had normal gait, could walk on his heels and toes without difficulty, had a normal stance, could perform a

full squat, could rise from a chair without difficulty, and needed no help changing for the exam

or getting on and off the exam table. (R. 460). She noted that Plaintiff's straight leg raise was

negative bilaterally, that he had full flexion in his lumbar spine, and that he had full rotary

movement bilaterally. (R. 461). She observed that Plaintiff had some decreased neck

mobility. (R. 461). She noted that Plaintiff's joints were "stable and nontender," but she

identified "12 positive trigger points" for fibromyalgia. (R. 461). She found that he had full

range of motion in his shoulders, elbows, forearms, wrists, and ankles. (R. 461). Dr. Lorensen

noted that Plaintiff had no sensory deficits, full strength in his upper and lower extremities, and

intact hand and finger dexterity with full grip strength. (R. 461–62).

Dr. Lorensen described Plaintiff's prognosis as "stable," and provided the following

medical source statement:

> There are no gross limitations [to] sitting, standing, walking, or
> handling small objects with the hands. There are moderate
> limitations for turning the head.

(R. 462).

### 3. Dr. Seok, State Agency Consultant

In December 2016, State agency consultant Dr. I. Seok reviewed Plaintiff's initial

application for disability benefits. (R. 54–69). Dr. Seok did not examine Plaintiff, but based

his evaluation on the medical evidence of record, including the consultative examinations and

treatment notes from Dr. Dreiner, Rome Medical Group, and New Hartford Psychiatric

Services. (R. 55–57, 69). Dr. Seok determined that Plaintiff's medically determinable

impairments included inflammatory arthritis, fibromyalgia, anxiety, and depression. (R. 58).

Dr. Seok found that Plaintiff's conditions would cause physical limitations, including an

inability to lift or carry over 20 pounds, an inability to stand and walk for more than 6 hours in

a workday, and an inability to sit for more than 6 hours in a workday.  (R. 60).  Dr. Seok

assessed that Plaintiff had no postural or manipulative limitations.  (R. 61).  Dr. Seok

concluded that Plaintiff was not disabled and could perform light work.  (R. 62).

### D.   ALJ's Decision Denying Benefits

On February 19, 2019, the ALJ issued a decision denying Plaintiff's application for

disability benefits.  (R. 15–25).  At step one of the five-step evaluation process, the ALJ

determined that Plaintiff had "not engaged in any substantial gainful activity since May 8,

2015, the alleged onset date."  (R. 17).

At step two, the ALJ found that, under 20 C.F.R. § 404.1520(c), Plaintiff had four

"severe" impairments: psoriatic arthritis, fibromyalgia, cervical and lumbar degenerative disc

disease, and headaches.  (R. 17).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or

combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (R. 20).

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity

("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR
> 404.1567(b) except he can stand and walk four hours in an eight-
> hour workday.  He would need an option to alternate to sitting for
> 30 minutes after every 30 minutes standing or walking.  He can
> remain on-task while sitting.  He can occasionally balance, stoop,
> kneel, crouch, crawl, and climb ramps and stairs.  He can never
> climb ropes, ladders, or scaffolds.  The claimant can frequently
> reach with both upper extremities.  He can never be exposed to
> heights or moving mechanical parts.  He can have occasional
> exposure to extreme heat, extreme cold, wetness, and humidity.  He
> can tolerate a moderate noise intensity level as defined in the
> Dictionary of Occupational Titles/Selected Characteristics of
> Occupations.  He can tolerate occasional exposure to light brighter

> than that typically found in an indoor work environment such as an
> office or retail store.

(R. 20).  The ALJ's decision explains that she reached this RFC determination based primarily on Plaintiff's testimony and the opinions of Drs. Seok and Lorensen.  (*See* R. 21–24).

At step four, relying on the testimony from the vocational expert, the ALJ determined that Plaintiff was able to perform past relevant work because the demands of his past relevant work "does not require the performance of work-related activities precluded by [the] residual functional capacity."  (R. 24).

At step five, based on the foregoing, the ALJ concluded that Plaintiff "has not been under a disability . . . through the date of this decision" under Section 216(i) and 223(d) of the Social Security Act.  (R. 24).

## III.    DISCUSSION

### A.  Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a "severe

impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 404.1520. The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including impairments that are not severe. *Id.* § 404.1545(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the

9

Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).  The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

## C.  Analysis

In challenging the Commissioner's denial decision, Plaintiff argues that the ALJ "committed reversible error by failing to properly apply the treating physician rule."  (Dkt. No. 7, p. 5).  Specifically, Plaintiff disputes the ALJ's decision to afford less than controlling weight to the opinion of Plaintiff's treating rheumatologist, Dr. Dreiner.  (*Id.*, p. 6).  Plaintiff asserts that the ALJ "fails to adequately discuss how these opinions are or are not well supported by medically acceptable clinical and laboratory diagnostic technique[s]."  (*Id.*).  Plaintiff further claims that the ALJ "cherry-pick[ed] a small portion of [Dr. Dreiner's] treatment notes to indicate inconsistency and portions of claimant's reported daily activities."  (*Id.*, p. 7).  Plaintiff also asserts that it was reversible error when the ALJ failed to explicitly consider each of the "*Burgess* factors" with respect to Dr. Dreiner, and that  the RFC

determined by the ALJ "does not include any limitations on movement of the neck even though Dr. Dreiner opine[d] that such limits exist and it is consistent with the opinion of consultative examiner Dr. Lorensen."  (*Id.*).

In response, the Commissioner asserts that the ALJ properly evaluated the opinion evidence in the record.  (Dkt. No. 9, pp. 3–10).  Specifically, the Commissioner claims that the ALJ's reliance on non-treating, non-examining physicians was proper because those opinions are consistent with other medical evidence in the record.  (*Id.*, pp. 3–5).  The Commissioner argues that the ALJ "gave good reasons for discounting Dr. Dreiner's opinion, [by] indicating that it was neither well-supported by the medical evidence, nor consistent with the other substantial evidence of record."  (*Id.*, pp. 5–6).  The Commissioner further contends that the RFC determined by the ALJ is supported by substantial evidence.  (*Id.*, pp. 10–11).

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources.  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).  However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings."  *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018).  In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

Relatedly, under the treating physician rule, an ALJ generally owes "deference to the medical opinion of a claimant's treating physician."  *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).  However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the

treating source opinion controlling weight." *Id.* When a treating physician's opinions are disregarded, the ALJ must provide "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(c). Indeed, the Second Circuit has instructed that courts should "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the ALJ's opinion does not "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

Recently, in *Estrella v. Berryhill*, the Second Circuit reiterated its mandate that ALJs must follow specific procedures in determining the appropriate weight to assign a treating physician's opinion. *See generally* 925 F.3d 90, 95–98 (2d Cir. 2019). The Circuit described the applicable standard, writing that:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, [the ALJ] must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

*Id.* at 95–96 (citing inter alia *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008)). The Circuit noted that failure to "explicitly consider" these factors is a procedural error warranting remand

unless a "searching review of the record assures the reviewing court that the substance of the treating physician rule was not traversed." *Id.* And the Circuit has further clarified that while failure to address each of the *Burgess* factors may constitute procedural error, it does not necessarily warrant a remand. *Guerra v. Saul*, 778 F. App'x 75, 77 (2d Cir. 2019).

### 1)  Dr. Dreiner's Opinions

Upon review of the record, the Court finds no error in the ALJ's decision to assign less than controlling weight to the opinions of Plaintiff's treating rheumatologist Dr. Dreiner. (*See* R. 23–24, 639–40). The ALJ found that Dr. Dreiner's assessments were entitled to "little weight" because "[h]er opinions are inconsistent with her own treatment notes, that documented only intermitted swelling in the claimant's fingers, but more often documented normal joint evaluations." (R. 23). The ALJ also found that Dr. Dreiner's opinions were inconsistent with: (1) "[Plaintiff's] reported ability to shovel snow, blow his driveway, and play golf"; (2) the observations of the examining consultant, Dr. Lorensen, who found that Plaintiff "could ambulate without difficulty and perform a full squat"; and (3) Plaintiff's testimony that he could lift 20 pounds. (R. 24). In sum, the ALJ stated that Dr. Dreiner's "opinions are inconsistent with the record as a whole and given little weight." (R. 24).

Indeed, Dr. Dreiner's treatment notes show that the severity of Plaintiff's pain varied widely, and Plaintiff's testimony about his daily activities supports the ALJ's conclusion that he is capable of performing light work, including his past work as a budget analyst. (*See generally* R. 30–53, 154–65, 204–365, 376–454, 570–618, 638–40). Although Dr. Dreiner opined that Plaintiff would "never" be able to crouch or squat, Dr. Lorensen's notes show that Plaintiff was able to perform a full squat and walk on his heels and toes without difficulty. (*See* R. 460, 640). Dr. Dreiner's opinion that Plaintiff would be unable to sit for more than 4

hours in a workday is also contradicted by Plaintiff's testimony that he spends most of his day sitting in a "hard chair." (*See* R. 40, 639). Accordingly, the Court finds that the ALJ provided good reasons for not giving controlling weight to the opinions of Dr. Dreiner. *See Lamond v. Astrue*, 440 F. App'x 17, 21–22 (2d Cir. 2011) (affirming the ALJ's decision not to give controlling weight to the opinion of a treating physician where opinions from non-treating examiners offered substantial evidence to the contrary).

Moreover, the Court finds that the ALJ sufficiently addressed each of the *Burgess* factors with respect to Dr. Dreiner. Specifically, the ALJ noted that Dr. Dreiner had treated Plaintiff "for several years" and that she specialized in rheumatology. (R. 22). The ALJ's decision provides a brief synopsis of Dr. Dreiner's treatment records and refers to specific treatment notes ranging from 2011 through 2018, showing that the ALJ considered her full treating history with Plaintiff. (R. 22). And the ALJ evaluated the consistency of Dr. Dreiner's opinions with the record as a whole, especially as compared to Dr. Lorensen's clinical assessment and Plaintiff's testimony about his daily activities. (*See* R. 23–24). In sum, while the ALJ could have provided more detail, the decision provides sufficient explanation for the Court to understand her rationale and determine that her ultimate conclusions were supported by substantial evidence. Accordingly, the Court concludes that even if the ALJ's decision glossed over any of the *Burgess* factors, the substance of the treating physician rule was not traversed in this case.

### 2) Dr. Lorensen's Opinions

The Court also finds no error in the ALJ's decision to afford only "partial weight" to the assessments of Dr. Lorensen. Among other things, the ALJ noted that Dr. Lorensen had only observed Plaintiff on one occasion, and that her opinions were "vague [and] without

specific vocational limitations." (R. 23). The ALJ also pointed out that Dr. Lorensen did not have access to Plaintiff's "hearing testimony or subsequent records from rheumatologist Dr. Dreiner." (R. 23). Nonetheless, the ALJ cited Dr. Lorensen's report in determining the RFC, particularly the observation that Plaintiff could ambulate without difficulty and perform a full squat. (R. 24). The Court thus finds that the ALJ provided good reasons for the weight given to the opinion of Dr. Lorensen. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

### 3) RFC Determination

Further, the Court finds no merit to Plaintiff's claim that the ALJ "cherry picked" the record for supporting evidence. To the contrary, the RFC determination is supported by the observations, opinions, and treatment recommendations of Plaintiff's medical providers and evaluators, the diagnostic imaging and laboratory test results, Plaintiff's testimony and representations, and the record as a whole. (R. 24). In particular, the ALJ noted substantial evidence that: (1) during several evaluations in 2015, Plaintiff reported that his "skin and joints felt good while taking medication"; (2) Plaintiff had no complaints or concerns during his annual physical exam in 2015; (3) in March 2016 Plaintiff "ambulated with a normal gait"; (4) in June 2016 Plaintiff exhibited "no active synovitis in any joint"; (5) in December 2016 Plaintiff reported some nerve sensitivity but his joints were "good"; (6) at his evaluation with Dr. Lorensen in February 2017, Plaintiff "was in no distress, ambulated with a normal gait, could walk on his heels and toes, and could perform a full squat"; (7) at the same exam, Plaintiff had "full range of motion in his lumbar spine, negative straight leg-testing, non-tender joints, and full strength and sensory function in all of his extremities"; and (8) during his evaluations with Dr. Dreiner in 2018, Plaintiff reported "feeling ok and stable, and his physical

examinations were again normal."  (R. 22).

Further, the RFC is supported by Plaintiff's reported activities of daily living.  The record shows that, despite Plaintiff's pain, he was able to golf on occasion, go shopping weekly, go out to dinner several times a month, perform yard work, mow the lawn on a riding mower, and shovel snow.  (*See* R. 41–42, 158, 204, 222, 470, 457, 486, 546, 616).  Plaintiff stated that he could not carry groceries, but he reported that he was able to perform other household chores including cooking, cleaning, laundry, dusting, vacuuming, and loading the dishwasher.  (R. 42, 457).  Plaintiff also reported that his medical conditions do not prevent him from attending to any self-care and grooming needs.  (*See, e.g.*, R. 155–56, 457, 460).  Notably, although Plaintiff complained to Dr. Dreiner about "morning stiffness" lasting several hours, the record also shows that he often denied experiencing any stiffness at all, or otherwise described it as "not too bad."  (*See, e.g.*, R. 204, 213, 227, 241, 256, 262, 268, 411, 505, 543).  While Plaintiff sometimes reported pain at a level of ten out of ten, other times he reported a zero or one.  (*See, e.g.*, R. 211, 222, 242, 244, 486).  All of the above was clearly incorporated into the ALJ's decision and provides substantial evidence for the RFC determination.  *See Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (noting that "whether there is substantial evidence supporting the [claimant]'s view is not the question here; rather, [the court] must decide whether substantial evidence supports the ALJ's decision").

Finally, the Court finds no error in the ALJ's decision not to incorporate neck limitations into the RFC.  Indeed, although both Drs. Lorensen and Dreiner found that Plaintiff suffered from moderate limitations with regard to his neck movements, Plaintiff fails to provide any support for his claim that such impediments would prevent him from performing light work.  Importantly, this Circuit has frequently stated that moderate exertional and non-

exertional limitations are not inconsistent with an RFC for light work.  *See, e.g.*, *White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (holding that a consultative examiner's assessment of moderate limitations to standing and performing other activities did not preclude an RFC for light work where other evidence in the record supported the ALJ's conclusions).

Here, the ALJ's decision demonstrates a thorough review of the medical evidence, and the RFC incorporates a number of exertional restrictions, including limitations on time walking/standing and options for Plaintiff to alternate positions from sitting to standing/walking every 30 minutes.  (R. 20–21).  The ALJ's decision discusses the severity of Plaintiff's neck impairments and found that they did not meet a listing because there was insufficient medical evidence of physical limitation.[2]  (R. 20).  Thus, upon review of the record, the Court finds no error in the ALJ's decision not to include in the RFC specific limitations for movement of the neck.  *See Melanie W. v. Comm'r of Soc. Sec.*, No. 19-CV-724, 2020 WL 2079432, at *10, 2020 U.S. Dist. LEXIS 75998, at *27–29 (N.D.N.Y. Apr. 30, 2020) (finding that "the ALJ did not err in failing to include plaintiff's cervical spine limitations in his hypothetical to the [vocational expert], as these limitations were already contemplated in the modified RFC for light work"); *see also Greg L. v. Comm'r of Soc. Sec.*, No. 18-CV-1339, 2020 WL 1332199, at *3, 2020 U.S. Dist. LEXIS 49433, at *8 (N.D.N.Y. Mar. 23, 2020) (finding no error in the ALJ's failure to include limitations for movement of his head and neck because the ALJ discussed the relevant medical evidence and developed an RFC that accounted for the limitations).

---

[2] The Court also notes that Plaintiff's counsel failed to question the vocational expert about the potential erosion of occupational opportunities based on Plaintiff's alleged problems with neck pain and mobility. (*See* R. 50–52).

IV.     **CONCLUSION**

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:    October 23, 2020
          Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge